RENDERED: NOVEMBER 22, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1049-MR

RHONDA DAVIS                                                          APPELLANT

v.
APPEAL FROM MARSHALL CIRCUIT COURT
HONORABLE ANDREA L. MOORE, JUDGE
ACTION NO. 18-CI-00359

RUBEN CUADRADO, M.D. AND
ANTHEM HEALTH PLANS OF
KENTUCKY, INC. D/B/A ANTHEM
BLUE CROSS AND BLUE SHIELD                                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, McNEILL, AND TAYLOR, JUDGES.

CALDWELL, JUDGE: Rhonda Davis ("Davis") appeals from a summary

judgment granted in favor of Dr. Ruben Cuadrado ("Dr. Cuadrado") on a medical

malpractice claim. The circuit court concluded Dr. Cuadrado was entitled to

summary judgment because Davis could not establish proximate cause at trial.

After our review, we affirm.

# FACTS

Rhonda Davis underwent an endoscopy and dilatation (EGD) at Marshall County Hospital, after arriving there the morning of October 3, 2017. Dr. Cuadrado performed the procedure. Davis had been referred to Dr. Cuadrado's office by her primary care physician to address her trouble with swallowing. Upon awaking from anesthesia in the afternoon following the EGD, Davis complained of difficulty breathing deeply. Soon thereafter, she became nauseous and vomited. Later, she also complained of pain in her chest.

To assess Davis's complaints, Dr. Cuadrado ordered a chest x-ray. A radiology report from Marshall County Hospital described the possible presence of infiltrate in Davis's left lung and indicated "worrisome for pneumonia." Dr. Cuadrado ordered a transfer to Jackson Purchase Medical Center in Mayfield, Kentucky ("Jackson Purchase") for Davis. Dr. Cuadrado would later testify this facility was chosen because he himself was already scheduled for work there later that same day. Additionally, Dr. Cuadrado cited a pulmonologist and intensivist being on staff at Jackson Purchase, to address what he suspected was pneumonia, as factors in choosing to transfer Davis there.

Later the same afternoon, soon after her admission to Jackson Purchase, a second x-ray was taken of Davis's chest. Dr. Cuadrado also ordered a

chest CT scan for Davis. A report on the CT examination indicated "possible esophageal rupture."

In response, a plan was established to transfer Davis to another facility for possible thoracic surgical intervention; Jackson Purchase did not have a thoracic surgeon on staff. After a suitable facility with an open bed was located, Davis was transferred to Barnes-Jewish Hospital in St. Louis, Missouri ("Barnes-Jewish"). There she was treated for an esophageal perforation. Davis remained hospitalized at Barnes-Jewish until October 14, 2017.

On October 1, 2018, Davis filed suit against Dr. Cuadrado and Marshall County Hospital. Delays and motion practice irrelevant to the inquiry at hand occurred. Eventually, the case was set for a jury trial, scheduled to begin August 16, 2023. During the spring and summer of 2023, the parties disclosed their respective experts and took depositions.

On April 1, 2023, Davis filed a disclosure indicating she had retained internal medicine physician Dr. Kushal R. Patel, M.D. ("Dr. Patel") as an expert witness to testify at trial. The record reflects Davis, in earlier stages of litigation, had originally alleged negligence on Dr. Cuadrado's part in performing the EGD. She alleged Dr. Cuadrado's negligently performing the EGD caused her to sustain an esophageal perforation, and all treatment necessary to address the esophageal perforation was required due to this alleged negligence. However, Dr. Patel's

expert disclosure, filed April 1, 2023, was not consistent with Davis's initial allegations. Dr. Patel did not opine that Dr. Cuadrado negligently performed the EGD, but instead opined that Dr. Cuadrado violated the standard of care in other ways such as in not immediately ordering a CT scan:

> 1. Standard of care for a patient with a possible esophageal perforation would be to have a CT scan, and that scan could have been and should have been performed at Marshall County Hospital the afternoon of the EGD procedure;
>
> 2. CT scan probably would have revealed the perforation, at which point, patient should be transferred to a facility with cardiothoracic surgical care available;
>
> 3. Because of the delay in diagnosis and treatment, additional leakage into the chest compartment probably occurred causing additional needless harm (beyond that which would have occurred even with prompt diagnosis and treatment).

Dr. Patel testified in a discovery deposition on May 18, 2023. There, he verified he did not intend to allege negligence in performance of the EGD at trial. He described his opinions in the case as focused upon the aspect of triaging and diagnosis. Dr. Patel expressed an opinion that Dr. Cuadrado should have ordered a CT "as soon as possible" at Marshall County Hospital, prior to transferring Davis to Jackson Purchase, which would probably have led to detection of the perforation in Davis's esophagus, in Dr. Patel's estimation. Had a CT scan immediately been performed, the period Davis was at Jackson Purchase

might have been avoided and she could have been transferred from Marshall Hospital directly to Barnes-Jewish, or another facility with available cardiothoracic surgeons, according to Dr. Patel's testimony.

Asked for specifics as to how the alleged delay adversely affected Davis, Dr. Patel testified, "I have general opinions, not specific." He elaborated that, as a general proposition, a longer hospital course will result from a longer period to recognize a perforation. However, when asked how much Davis's hospital course had been lengthened due to the delay in treatment, he responded that "not being a cardiothoracic surgeon I can't comment exactly" and he was unable to offer any opinion as to how long. Throughout follow-up responses on the subject, Dr. Patel consistently testified he was unable to differentiate between harm Davis would have inevitably suffered, even with a quicker transfer, and that which was caused by the delay he alleged.

On June 13, 2023, Dr. Cuadrado filed a motion for summary judgment, arguing Dr. Patel, Davis's sole retained expert, had failed to establish the requisite causation between Dr. Cuadrado's allegedly negligent act and Ms. Davis's asserted injury.[1] Dr. Cuadrado additionally offered several arguments for

---

[1] Previous to this, on June 6, 2023, Marshall County Hospital had filed a motion for summary judgment, arguing Dr. Patel offered no criticism of the hospital or its agents. The motion was never contested by Davis. Consequently, all claims against Marshall County Hospital were dismissed shortly before the scheduled trial date.

summary judgment related to Dr. Patel's testimony regarding the standard of care and Dr. Patel's qualifications. Simultaneously with his motion for summary judgment, Dr. Cuadrado filed a motion *in limine* to exclude Dr. Patel from testifying at trial. Davis filed a response opposing the motion for summary judgment and Dr. Cuadrado followed with a reply. The matter was argued before the trial court on August 8, 2023, at a pretrial conference. Following the hearing, the Marshall Circuit Court issued an order granting Dr. Cuadrado's motion for summary judgment, as well as his motion *in limine* to exclude the testimony of Dr. Patel.

This appeal followed.

## STANDARD OF REVIEW

When reviewing an order granting summary judgment, we are to evaluate "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); CR[2] 56.03. In doing so, we apply a non-deferential *de novo* standard of review is applied. *See Adams v. Sietsema*, 533 S.W.3d 172, 177 (Ky. 2017) (granting summary judgment is a legal rather than factual determination subject to *de novo* review). During review, we remain mindful of the trial court's obligation to construe any evidence

---

[2] Kentucky Rules of Civil Procedure.

in the light most favorable to the party in opposition, when ruling on a motion for summary judgment. *See Andrew v. Begley*, 203 S.W.3d 165, 169 (Ky. App. 2006) ("In considering a motion for summary judgment, the court must view all the facts and inferences drawn therefrom in the light most favorable to the party opposing the motion, and all doubts are to be resolved in his or her favor.").

## ANALYSIS

### To Prove the Element of Causation in Medical Malpractice Claims, Expert Testimony is Generally Required

Expert testimony is generally required to prove medical malpractice in Kentucky. *See Blankenship v. Collier*, 302 S.W.3d, 665, 675 (Ky. 2010) ("[A] plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony to inform the jury of the applicable medical standard of care, any breach of that standard and the resulting injury."). For the element of causation in particular, expert testimony is generally required, if a medical malpractice action is to withstand a dispositive motion:

> "It is beyond dispute that causation is a necessary element of proof in any negligence case." *Baylis v. Lourdes Hosp., Inc*., 805 S.W.2d 122, 124 (Ky. 1991). "[I]n most medical negligence cases, proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony." *Id.* (Footnote omitted); *see also Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006). Thus, in order "[t]o survive a motion for summary judgment in a medical malpractice

case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper." *Andrew*, 203 S.W.3d at 170.

*Rogers v. Integrity Healthcare Services, Inc.*, 358 S.W.3d 507, 511-12 (Ky. App. 2012) (footnote omitted).

Where expert testimony on the element of causation is required, the expert's theory must reflect a causal connection between a defendant's conduct and a plaintiff's injury expressed as a likelihood to a degree of *reasonable medical probability*:

> [P]roximate causation is a necessary element of a medical malpractice claim; the complainant must demonstrate that the medical professional's breach of the standard of care was a proximate cause of the complainant's injury. *See Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) (citations omitted). To be the proximate cause of the injury, the conduct in question must be a substantial factor in causing the injury. *See Bailey v. North American Refractories Co.*, 95 S.W.3d 868, 871 (Ky. App. 2001). Such proximate causation must be shown by a reasonable degree of medical probability, rather than mere possibility or speculation. *See Baylis*, 805 S.W.2d at 124; *Morris v. Hoffman*, 551 S.W.2d 8, 11 (Ky. App. 1977).

*Ashland Hospital Corporation v. Lewis*, 581 S.W.3d 572, 577-78 (Ky. 2019).

To determine whether an expert opinion demonstrates a theory of causation which is effectively expressed within a reasonable degree of medical probability, we keep in mind that: "substance should prevail over form and that the total meaning, rather than a word-by-word construction, should be the focus of

the inquiry." *Baylis*, 805 S.W.2d at 124 (citing *Walden v. Jones*, Ky., 439 S.W.2d 571 (1968); *Morris v. Hoffman*, 551 S.W.2d 8 (Ky. App. 1977)). Nevertheless, to meet this threshold, an expert "must indicate that an alleged negligent act *probably* caused the injury and that a nexus between the alleged act and the injury *is not merely a speculative possibility*." *Richmond v. Hunt*, 596 S.W.3d 103, 106 (Ky. App. 2019) (emphasis added) (citing *Jarboe v. Harting*, 397 S.W.2d 775 (Ky. 1965); *Jackson v. Ghayoumi*, 419 S.W.3d 40 (Ky. App. 2012); *Brown-Forman Corp. v. Upchurch*, 127 S.W.3d 615 (Ky. 2004); *Turner v. Commonwealth*, 5 S.W.3d 119 (Ky. 1999)).

### The Testimony of Davis's Medical Expert Failed to Establish More Than a Speculative Possibility as to Causation of Any Specific Injury

The issue of causation was the primary topic of Dr. Cuadrado's motion for summary judgment. At oral arguments, the trial court's inquiries focused on the issue. However, to the trial court and now on appeal, Davis has offered little to address the issue. She argues, without citation, the "dollar value" of harm "need not be proven with specificity[.]" However, this merely sidesteps the issue at hand – proof of causation to a reasonable medical probability beyond mere speculation is required to prevail on a medical malpractice claim.

To the trial court and, now on appeal, Davis has characterized Dr. Cuadrado's motion for summary judgment as an argument that: "she should be denied a recovery because she has no crystal ball or expert able to specify how

-9-

much better off she would have been without the unnecessary delay." At several other points in her brief, she acknowledges the paucity, within the record, of proof to distinguish harm she would have invariably suffered from the esophageal perforation from harm she alleges was caused by Dr. Cuadrado. She concedes: "one difficulty with this case is proving the amount of harm caused by the delay in receiving appropriate treatment caused by [Dr. Cuadrado's] improper treatment and improper transfer to Jackson Purchase." Additionally, she acknowledges: "it is difficult to measure how much better off Rhonda Davis would be if Dr. Cuadrado had obtained a CT scan early in the afternoon or sent her to a facility with CT and Thoracic surgeons capable of treating an esophageal perforation."

Despite these concessions, at another point, Davis takes the position Dr. Patel was sufficiently specific. To this Court, as she previously alleged to the trial court, Davis asserts: "Dr. Patel has stated that it is more likely than not that damage occurred in Rhonda's mediastinum (chest cavity) during the delay and because of the delay." This statement does appear consistent with the third bullet point in Dr. Patel's expert disclosure. However, Davis neither quotes nor cites any specific passage from Dr. Patel's deposition in support. Dr. Cuadrado argues to this Court, as he had to the trial court, that no such statement is actually made by Dr. Patel in his discovery deposition. The full deposition of Dr. Patel was tendered

to the trial court and the parties were advised an order resolving the summary judgment motion would issue following review of the deposition.

Our review of the deposition confirms Dr. Patel declined to point to any specific injury in Davis's chest or otherwise, caused or worsened by the delay, outside of speculation and mere possibility. He offered the general opinion that, with an esophageal perforation "you could have two environments mixing and then there's different things in those environments. In our case stomach acid is one of the things, right. And perforation alone can cause inflammation and things like that, but the things mixing can also add to that." However, Dr. Patel pointed to nothing specific in Davis's injuries or medical records to distinguish where inflammation, or any other condition, might have been aggravated by the alleged delay.

Dr. Patel conceded to being unable to identify many specific details as to what Davis's condition was or treatment she received during her hospitalization at Barnes-Jewish, not merely an inability to distinguish between the harm caused by the delay he alleged and the harm incident to the esophageal perforation itself. Furthermore, he was unable to specify the length of the delay he was alleging. Dr. Patel testified he didn't remember the "timeline" for Davis's treatment at Barnes-Jewish and how quickly she was treated there. He also conceded being "hazy on the timeline of the transfer as well" that took place "[b]etween the second and third

-11-

hospital." Questioned what he meant by this, he verified he did not know when it was this transfer occurred.

"[A]n expert cannot speculate based on general, simplified information regarding diagnosis and treatment." *Ashland Hospital v. Lewis*, 581 S.W.3d 572, 580 (Ky. 2019). As with this case, the allegation in *Ashland Hospital* was that failure to timely diagnose caused greater injury than would have occurred with earlier intervention, in that case a stroke rather than an esophageal perforation. *Id*. at 575-76. At a deposition in *Ashland Hospital*, the lone retained expert testified it was "impossible to tell" which specific effects the plaintiff suffered from the stroke might have been avoided by earlier intervention. *Id*. at 575.

The plaintiff in *Ashland Hospital* attempted to rely upon testimony by other physicians who affirmed, as a general matter, it was important to treat strokes promptly and "time lost was brain lost." *Id*. at 580. However, our Supreme Court noted "when the expert witnesses were asked to consider the specifics of this case, they were unable to state with a reasonable degree of medial probability that the conduct [of the defendants] was a substantial factor in causing [plaintiff's] injuries." *Id*.

The general statements from Dr. Patel on the matter of causation are similar to those relied upon in *Ashland Hospital*. As was the case there, Dr. Patel

simply affirms the general proposition that timely treatment is important. *Id*. at 580. We detect no error in the trial court's finding that Dr. Patel "could not specifically point to any specific facet of the Plaintiff's care that she would not have needed had there been no delay or any other specific outcome that resulted because of the delay." In other words, Davis failed to present an expert opinion stating to a reasonable medical certainty that Dr. Cuadrado's conduct was a substantial factor in causing Davis's injuries. *See id*. Accordingly, there was no genuine issue of material fact on the issue, and Dr. Cuadrado was entitled to judgment as a matter of law.

Having determined the circuit court did not err in granting summary judgment on the issue of causation, it is unnecessary to further scrutinize the trial court's order on issues relating to Dr. Patel's testimony on the standard of care. Further arguments in the parties' briefs not discussed herein have been determined to lack merit or relevancy to our resolving this appeal.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE RUBEN CUADRADO: |
|---|---|
| David Vance Oakes Paducah, Kentucky | James R. Coltharp, Jr. Paducah, Kentucky |

-13-